MAYHEW and others *v.* WEST VIRGINIA OIL & OIL LAND Co. and others.

*(Circuit Court, D. West Virginia. 1885.)*

RECEIVER — JUDICIAL SALE OF CORPORATE PROPERTY — CONTRACT — PURCHASE FOR CREDITORS—LIABILITY OF BIDDER FOR FAILURE TO MAKE PAYMENT— RESALE—CONFIRMATION OF SALE.

On motion (1) to confirm sale made to Charles H. Shattuck, March 17, 1885; (2) for a decree against J. N. Camden, personally, for the difference between his bid of $173,050, October 1, 1884, and that of Shattuck, March 17, 1885, of $119,100; (3) to set aside order entered November 3, 1884, canceling the bond of Thompson and Payne and Chancellor, and directing a return of the deposit of $10,000.

WAITE, Chief Justice. The facts on which these motions depend are as follows:

Prior to the entry of the decree of November 17, 1883, an instrument in writing was prepared for the signatures of J. N. Camden, J. H. Carrington, W. H. Beach, A. C. Worth, Toledo National Bank, R. S. Blair, B. B. Valentine, and Heman Loomis, purporting to be a contract between these parties to protect their several interests in the suit, and to insure a sale of the property for an amount sufficient to pay the debts due to them respectively, in full. This paper was signed by Camden, Carrington, Worth, Valentine, and Blair before the decree was rendered. It has never been signed by the Toledo National Bank, nor by Beach. It provided in substance that at the sale under the decree Camden should purchase the property if it sold for a price less than the aggregate of all the claims adjudicated against it, with interest, costs, and expenses; that if such purchase should be made by him, the other parties would assign their respective claims under the decree, so that they might be used in payment of the purchase money; that Camden should execute and put on record a declaration of trust to the effect that he would hold and manage the property to the best advantage, without charge for his own time, and apply the rents, issues, and profits to the payment in full of the amount due on the decree in favor of Thompson, of which he (Camden) was the assignee, and divide the remainder monthly between Loomis and the other beneficiaries in the proportion of 40 per cent. to Loomis and 60 per cent. to the others, until their respective claims were fully satisfied; and that when the debts were all paid, Camden was to become the owner of the property free of all claims by the other parties, who were to execute the necessary releases for that purpose. Although this contract refers to the decree as already entered, in point of fact the entry was not made until after all the parties who have ever signed the contract had affixed their signatures.

The decree, as entered November 17, 1883, directed a sale of the property, and an application of the proceeds to the payment, with interest from that day, of the following debts:

| | | |
|---|---|---:|
| 1. William D. Thompson, | | $61,267 79 |
| Richard A. Storrs, | | 47,663 29 |
| Heman Loomis, | | 39,476 61 |
| (All these debts have equal priority of lien.) | | |
| 2. James H. Carrington, | | 46,934 58 |
| 3. A. C. Worth, | | 2,650 08 |
| 4. W. H. Beach, | | 2,888 58 |
| 5. Toledo National Bank, | | 9,843 70 |
| R. S. Blair, | | 593 16 |
| (The debts due the bank and Blair having equal priority.) | | |

| 6. R. S. Blair, | | | | | | | 592 66 |
| 7. Benjamin B. Valentine, | | | | | | | 9,056 93 |
| 8. Heman Loomis, | | | | | | | 49,111 16 |

The debt to Thompson had been assigned to and was owned by Camden at the time of the rendition of the decree.

At the time of the entry of the decree there was a large sum of money in the hands of the receiver applicable to the payment of the debts, and with the consent of Thompson (Camden) and Loomis, it was ordered that this be applied—*First*, to pay Storrs in full; and, with the assent of Loomis, *second*, to pay Thompson (Camden) in preference to him, (Loomis.) Under this order the following payments were made before May 1, 1884:

| November 20, 1883. | To Storrs, in full, | | | | $47,687 12 |
| | " Camden, | | $27,190 93 | |
| January 2, 1884. | " " | | 2,000 00 | |
| March 5, " | " " | | 1,500 00 | |
| April 21, " | " " | | 2,000 00 | |
| | | | | | $32,690 93 |

On the first day of May, 1884, the property was offered for sale under the decree by the commissioners appointed for that purpose. Camden was present at the sale, as were also the most of the creditors, either in person or by attorney. The president of the Toledo National Bank was there with the others, and if Camden had purchased the property under the contract, would have assigned the debt due the bank to be used in payment of the purchase money, upon the terms and conditions provided for in the contract. Beach had also executed an assignment of the debt due to him, and placed it in the hands of his attorney, who was present, to be delivered to Camden if he purchased under the contract. Camden did not, however, bid at all at this sale, and his reason for not bidding is given in his answer filed in this proceeding in these words:

"Respondent was advised and informed that the debt of Loomis was attacked in this honorable court, and that such proceedings were had that, by direction of the court as to the debt of said Loomis, the amount thereof should be paid into the registry of the said court, to await the determination of the proceedings in relation thereto, thus requiring a large sum of ready money to be paid for that purpose; and the said creditors not indicating any willingness to aid your respondent in raising said money, and this respondent, at the time said contract was entered into, not contracting or expecting to be called upon to advance any money upon his bid to purchase under said contract, the said contract not requiring him to do so, respondent was advised that it was not safe for him to bid unless he was prepared to pay at least the amount of the Loomis debt into court. Under this advice respondent declined or refrained from bidding at the first sale of the property, on the ground that he might incur a personal liability in bidding under the contract, if the amount of the Loomis debt was required to be paid into court to await indefinite litigation."

All the creditors were desirous of having Camden make the purchase under the contract, and would have assigned their respective claims to him on the terms provided for, if he had so done. Of all this Camden was informed, and when he declined to buy, some of the other creditors joined together and ran the property up on the bidding to $162,000. This was enough to protect the interests of all the creditors who were bidding; and when Charles H. Shattuck afterwards bid $163,000, the property was struck off to him, no one offering more. Loomis was not among the creditors who joined in the bidding. Camden was present all the time, and made no objection to what was done. Shattuck, the purchaser, was the receiver appointed by the court to

collect the rents and profits of the property pending the suit. His purchase was made for the benefit of himself, Robert Garrett & Sons, and some others. The others were certain stockholders of the West Virginia Oil & Oil Land Company, who had joined together for that purpose.

Camden was a stockholder and president of the Camden Consolidated Oil Company, a West Virginia corporation, having its principal office in Parkersburg. He was also a stockholder in the Standard Oil Company. These two companies were, more or less, connected in business. At some time after this sale, but at what precise time does not appear from the evidence, Camden left this country on a visit to Europe. Before leaving, however, he employed Charles Marshall, of Baltimore,—said to have been at the time the general attorney of the Camden Consolidated Oil Company,—to resist a confirmation of the sale. The ground of his objection to the sale was, as he states in his answer, that as Shattuck was the receiver of the property sold, he stood in such a confidential and trust relation to the parties as to prevent him from buying.

On the tenth of June, Loomis filed exceptions to the report of sale of the commissioners, on the following grounds: (1) Inadequacy of price; (2) misleading and doubtful expressions of the court in the course of certain proceedings, the object of which were to set aside or modify the decree in favor of Loomis; (3) surprise; (4) incompetency of the receiver to buy; and (5) uncertainty of the amount to be paid Loomis from the proceeds of the sale. The exceptions were signed by B. M. Ambler, as counsel for Loomis. No other exceptions were taken to the confirmation of the sale. Before the motion for confirmation came on for hearing, the secretary of the Camden Consolidated Oil Company opened negotiations with William P. Thompson and Oliver H. Payne,—the one a vice-president and the other treasurer of the Standard Oil Company,—upon the subject of raising the bid of Shattuck, with a view of procuring an order for a resale of the property. Thompson was a stockholder in the Camden Consolidated Oil Company, and a brother-in-law of Camden. The motion for confirmation came on for hearing June 18th. When the exceptions as to the insufficiency of the price were under argument, Mr. Marshall or Mr. Ambler was asked by the court whether it was proposed to submit an offer of a larger sum for the property in case a resale should be ordered. To this question an affirmative answer was given, and within a short time thereafter a telegram, of which the following is a copy, was received by the clerk:

"CLEVELAND, 6–19, 1884.

*"To L. B. Dellicker, Clerk U. S. Court:* If there should be a resale of the West Virginia Oil and Oil Land Co. property, under decree of November 17, 1883, we bind ourselves to bid not less than $173,000, and if knocked down to us, to pay therefor.

[Signed]

"W. P. THOMPSON.
"O. H. PAYNE."

About the same time, the secretary of the Camden Consolidated Oil Company got information from Thompson and Payne that such a telegram had been sent, and he thereupon instructed Mr. Marshall to present the offer to the court, which was done. The court thereupon announced its determination to set aside the sale and offer the property again, if Thompson and Payne would secure their offer by depositing $10,000 in the registry of the court, and giving bond, with approved security, in the penal sum of $250,000, conditioned to that effect. Thompson and Payne having, through their counsel, signified their willingness to comply with the terms proposed, the secretary of the Camden Consolidated Oil Company obtained from Mr. William N. Chancellor, of Parkersburg, a promise that he would sign the bond as surety. This being satisfactory to the parties, the counsel in the cause set about preparing

the form of an entry of the order to be made on the minutes. In doing this, some difference of opinion was found to exist as to what would be required of Thompson and Payne under their offer; those acting for Thompson and Payne claiming that it would be enough if they bid the amount offered the next time the property was put up for sale under the decree, while it was insisted on behalf of the creditors that they should be required to repeat their bid every time the property was offered, until a sale should be made and confirmed by the court. On application to the court for further instructions in this behalf, it was decided that the order should be of the character asked by the creditors. Thereupon the order was drawn up and assented to by the parties, and approved by the court, in the following form:

"This cause came on to be heard on the eighteenth and nineteenth days of the present month, upon the motion to confirm the sale made by J. B. Jackson and W. S. Cole, special commissioners under the decree passed and entered in this cause on the seventeenth day of November, 1883, and upon a petition filed herein by Heman Loomis, to set aside the sale of the property of the defendant company, made on the first day of May, 1884, and upon exceptions taken by the said Loomis to the report of said sale returned to the court by said special commissioners, and upon an application made by Wm. P. Thompson and Oliver H. Payne to have the sale set aside, and offering to bid at a resale of the property the sum of $173,000, and was argued by counsel. Upon consideration whereof, it was, on the nineteenth day of June, (instant,) adjudged that all the objections and grounds of exceptions assigned by Heman Loomis against the confirmation of the said sale made by said special commissioners to Charles H. Shattuck, on May 1st, be overruled, except the first, and that the said first ground of exception would be sustained, provided that the said Wm. P. Thompson and Oliver H. Payne should, within ten days, enter into a bond, with approved security, in the penalty of $250,000, payable to Lyman B. Dellicker, the clerk of this court, conditioned that at any future sale of said property that may be made by decree in this cause, the said Thompson and Payne, or some one for them, will bid the sum of $173,-000, and that they will comply with the terms of said decree of sale in case they shall become the purchasers of said property at the said sum of $173,000; and provided further, that the said Thompson and Payne shall deposit in the registry of this court, within said ten days, the sum of $10,000 in cash, as additional security for their compliance with the offer made by them, and that the said Loomis shall, within said ten days, refund the sum of $143.65 paid by Lavinia H. Austin for advertising, and pay to the purchaser at said sale the sum of $407.50, the same being the interest accruing upon the amount of the purchase money actually paid, from the day of sale to the date of this decree."

The form of the entry having been agreed upon, no further proceedings were had until June 30th, when there was presented to the court a bond in the penal sum of $250,000, executed by Thompson and Payne as principals, and Chancellor as their surety, conditioned according to the order of the court, and a certified check of the Camden Consolidated Oil Company on the First National Bank of Parkersburg for $10,000. At the same time the costs and interest specified in the order as agreed on were paid by the same company for Loomis. Thereupon, the order, which had been approved June 19th, was entered on the journal of the court, and the first sale was set aside and a resale ordered.

Before the bond was signed by Chancellor, the secretary of the Camden Consolidated Oil Company procured for him, from Thompson and Payne, their individual bond of indemnity to him against any liability he might incur thereby. The check for $10,000 was at first deposited, by order of the court, in the Citizens' National Bank in Parkersburg, but afterwards it was withdrawn from that bank and deposited in the First National Bank, on interest, at the rate of four per centum per annum. At what precise time this change was made, or on whose application, does not appear. When all this was

done Camden was in Europe. He returned before September 30th, and on that day Loomis, through Mr. Ambler, his attorney, served on him (Camden) a notice to buy the property under the contract at the sale to take place the next day, and that unless he did buy, or run the property up to the required amount, he would hold him responsible therefor. It now appears, from a statement made by Camden to the court at the present hearing, that before this time an arrangement had been made between him and Loomis for a joint ownership of the property after the other creditors were paid. At what time this new arrangement was made was not stated, and the other creditors were not in any manner affected by it. The effect of it was to change the contract, as between Camden and Loomis, so that when the other creditors were paid out of the rents and profits, the property would be owned, two-thirds by Loomis and one-third by Camden.

The property was again offered for sale on the first of October, and Camden came to the place where the sale was to be made before the bidding began. After his arrival, he went to the auctioneer, who had been employed to cry the sale, and told him he would bid $173,000 for the property as the agent of Thompson and Payne. The sale was then opened by the auctioneer, and this bid was cried for some little time. Camden then bid $173,050. This bid was also cried, and, no one offering more, the property was struck off to Camden at that price. When he made the bid he did not state that he was acting for any one but himself, or that he was bidding under the contract, or that he expected to pay for the property otherwise than in money. After the sale was closed, the commissioners went with him to his office to get the money. On their arrival there, Camden produced the contract, and asked that it be accepted in lieu of money. This the commissioners declined to do, as their instructions were to sell for cash only. At this interview Camden did not intimate that, if the court declined to give effect to the contract, he would not pay the money; but, on the contrary, told the commissioners that, if required to do so, he would complete the payment in that way. He was, however, anxious to have the return of the commissioners show his offer of the contract in lieu of money, and not his offer of money, so that he might, if possible, secure a purchase under the contract. To this the commissioners did not object; and accordingly, in their return, after setting forth the sale, they state that "Camden did not and has not paid to your commissioners the sum of money so bid and offered by him for said property as aforesaid, or any part thereof; but when your commissioners required the cash from said Camden, pursuant to the terms of said sale, he tendered to us a paper purporting to be a copy of a contract," (here follows a general description of the contract before referred to.) "Said copy of the contract, with a paper thereto attached, signed by Heman Loomis, by B. M. Ambler, his attorney, bearing date September 30, 1884, is herewith filed. * * * Your commissioners declined to receive the said contract in payment, in whole or in part, of the purchase money so bid by said Camden for said property, or to accept anything in payment thereof except lawful money of the United States, and this the said Camden has not as yet paid."

Mr. J. B. Jackson, one of the commissioners, went to Wheeling after the sale was closed, and the next day, October 2d, Camden telegraphed him at that place, as follows:

"PARKERSBURG, October 2, 1884.

"*To Gov. J. B. Jackson:* Please see that my bid is reported as based solely on the contract presented in payment, without any qualification or conditions that would affect me personally on my bid.        J. N. CAMDEN."

Mr. Cole, the other commissioner, and who was one of the counsel for the other creditors, resided at Parkersburg, where Camden was, but no such communication was made to him.

v.24f, no.5—14

The report of the sale was filed with the clerk on the fourth of October, and on the sixth of the same month Camden filed in court a petition setting up the contract, and the demand which had been made on him before the sale, and praying "that, the premises being considered, he may be allowed to apply the claims and debts adjudged by said decree in discharge of his liability for the purchase money; that his compliance with the terms of said contract may be considered and decreed a compliance with the terms of said sale; that the said contract may be received in discharge of his bid; that the sale be confirmed, and that a decree be made to your petitioner for the said property; and that the court will make such further order and decree, and grant such other general and further relief in the premises, as your honors may deem right, as in equity may be proper, and as in duty bound, etc., he will ever pray," etc.

This petition is signed by Mr. Caleb Boggiss, one of the attorneys of this court, as counsel for Camden. In the petition it is stated that Camden is "largely interested to have the contract performed and executed, and that he desires that it may be done." The manner in which he is interested does not appear, except in the contract, and no mention is made of any new arrangement with Loomis. To this petition answers have been filed by all the creditors, except Loomis, objecting to the relief asked by Camden.

On the fourteenth of October, Carrington, Worth, Beach, Blair, the Toledo National Bank, and Valentine filed exceptions to the report of the commissioners on the ground that the purchase money had not been paid, and "prayed that said report be recommitted to said commissioners, with directions that unless the said Camden do at once comply with the terms of sale by paying to said commissioners the sum of $173,050, that said real estate and property may be resold at the risk and costs of the said Camden." Upon the filing of this petition the following order was made by the court: "And it appearing to the court that at the sale of said property on the first of October, 1884, held pursuant to said decree, J. N. Camden became the purchaser of said real estate and property for the sum of $173,050, and that he has failed to comply with the terms of sale by paying said sum of money, or any part thereof, to said commissioners, or into the registry of this court, thereupon, on motion of the said defendants, Carrington, Beach, Worth, Blair, Toledo National Bank, and Valentine, a rule is awarded against the said J. N. Camden, returnable on the third day of November, 1884, to show cause, if any he can, why he should not pay to said commissioners, or into the registry of the court, the said sum of $173,050, so bid by him for said property as aforesaid, or why said sale should not be set aside, and said real estate and property resold by said commissioners at the risk and costs of said Camden."

On the third of November the parties all appeared, either in person or by counsel, and, the court not being able to take up the matter at that time, the further hearing was postponed until December 2d. At that time Camden was represented by his counsel, Mr. Boggiss. The order postponing the hearing was made in the forenoon of that day. During the afternoon of the same day, Mr. Boggiss, who had been employed by the secretary of the Camden Consolidated Oil Company to act as attorney for Thompson and Payne, appeared in court and moved for a cancellation of their bond, and a return of their deposit of $10,000, with the interest which had accrued thereon. Neither at that time nor at any time before had it been intimated to the court that if the prayer of the petition of Camden was not granted, he would not promptly pay the full amount of his bid in money. On the contrary, the recollection of the judge holding the court at the time is distinct that it was expressly stated, either in the forenoon or the afternoon, or both, that the bid of Camden was *bona fide*, and would be paid in money if required. Under these circumstances, as Camden was known to be able financially to pay the money, if an order to that effect was made, the following entry was directed by the court:

"This day came Wm. P. Thompson and Oliver H. Payne, and moved the court to release their surety, W. N. Chancellor, from the obligation of their bond in the penalty of $250,000, dated the twenty-first of June, 1884, conditioned to bid at a future sale of the property, directed by a decree in this cause to be sold, the sum of $173,000, and filed in this court in this cause on the twenty-third day of June, 1884, pursuant to a decree rendered therein on the nineteenth day of June, 1884, and also moved the court to make an order directing that the sum of $10,000 deposited by them in court in this cause on the twenty-third day of June, 1884, pursuant to the last above-named decree, together with the accrued interest, be refunded to them. And it appearing to the court from the report of J. B. Jackson and W. L. Cole, filed in this cause on the fourth day of October, 1884, that said Thompson and Payne did in all respects comply with the conditions of said bond, and that at said sale a higher bid than they undertook to make was made by J. N. Camden, which has been reported and accepted by said commissioners, it is therefore ordered that the said bond be canceled, and the parties thereto released therefrom. And it is further ordered that the said sum of $10,000 so deposited by them, together with the interest that has since accrued thereon, be refunded to the said Thompson and Payne out of the registry of the court. It is further ordered that L. B. Dellicker is entitled to receive a commission of one per cent. on the amount so received and refunded, to be taxed in the bill of costs; and the receiver is ordered to pay the same out of any funds in his hands."

When this order was made, none of the creditors interested in the proceeds of the sale were present in person or by attorney, and they had no notice that any such application was to be made. The next day a check was made by the clerk, and properly countersigned by the judge, on the First National Bank, to the order of the Camden Consolidated Oil Company, for $10,098 28-100, the amount of the deposit, and the accrued interest thereon, and delivered to the secretary of the Camden Consolidated Oil Company, who gave a receipt therefor as follows:

"Received, Parkersburg, November 4, 1884, from L. B. Dellicker, clerk U. S. district court, the sum of ten thousand and ninety-eight 89-100 dollars, money deposited by Payne and Thompson in case of *Mayhew et al.* vs. *W. Va. O. & O. L. Co.*         Camden Consolidated Oil Co.,
                                             "L. A. Cole, Sec'y."

The clerk, however, required a receipt from Thompson and Payne, and this the secretary agreed to get. Afterwards he obtained and delivered to the clerk such an instrument, a copy of which is as follows:

"Received of L. B. Dellicker, clerk of the circuit court of the United States for the district of West Virginia, ten thousand and ninety-eight 89-100 dollars, being in full for $10,000, with accumulated interest, heretofore deposited by William P. Thompson and O. H. Payne, under an order of said court, in the case of *F. L. B. Mayhew & Co.* v. *The West Virginia Oil & Oil Land Company and others,* passed on the nineteenth day of June, 1884, and which is now, with its accumulated interest, directed to be returned to the said W. P. Thompson and O. H. Payne by an order of the said court in the same cause, passed on the third day of November, 1884.

"$10,098.89.         [Signed]         W. P. Thompson.
                                        "O. H. Payne."

As soon as the order for the cancellation of the bond was entered, the secretary of the Camden Consolidated Oil Company took a copy and presented it to Chancellor, who thereupon surrendered to him the indemnity bond of Thompson and Payne. This bond the secretary afterwards returned to Thompson and Payne. In all these transactions Thompson and Payne were represented by the secretary of the Camden Consolidated Oil Company, and they never at any time appeared in person.

On the twenty-first of November, Carrington, Worth, the Toledo National Bank, Valentine, and Blair, having heard of the order canceling the bond and surrendering the deposit, filed a petition to have that order set aside, and on the second of December the court made an order in reference thereto, as follows: "This day came James H. Carrington, A. C. Worth, William H. Beach, the Toledo National Bank, Benjamin B. Valentine, and Robert S. Blair, by W. C. Cole, their attorney, and moved the court to set aside the order made in this cause on the third day of November, 1884, returning to Oliver H. Payne and William P. Thompson the ten thousand dollars heretofore deposited by them in the registry of this court, and canceling their bond in the penalty of $250,000, with Wm. N. Chancellor as security, according to the prayer of their petition filed in this cause; and it appearing that notice of this motion and of the filing of said petition has been given to the said Oliver H. Payne, William P. Thompson, and William N. Chancellor, it is ordered that this motion be placed on the docket, and the consideration thereof is continued until a future day of this court." This petition was filed and the entry thereon made during the term in which the order of cancellation was granted, but the matter was not disposed of before the adjournment. It therefore went over to the next term, which is the present term, as unfinished business.

On the twenty-second day of January, 1885, and during the present term, the motions connected with the sale of October 1, 1884, all came on for hearing, and the decision in reference thereto appears in the following order which was then made: "This cause came on to be heard at the present term upon the report of J. B. Jackson and W. L. Cole, commissioners, heretofore appointed to make sale of the property mentioned in this cause, filed on the fourth day of October, 1884, whereby it appears that J. N. Camden bid the sum of $173,050 for said property, when it was offered for sale by said commissioners at public auction, on the first day of October, 1884, pursuant to a former decree of this court passed in this cause, and the said commissioners accepted the bid of said Camden, but that he has not complied with the terms of sale by paying to said commissioners the amount of said bid, or any part thereof. Upon consideration of the said report, and the exceptions filed thereto by several parties to this suit, and the rule heretofore awarded against said Camden to show cause why said property should not be resold at his cost and risk, and the petition of said Camden treated and considered as his answer to said rule, and the answers to said petition filed by the exceptors to said report, and the arguments of counsel for said Camden and said exceptors, and the said Camden still failing to comply with the terms of said sale by paying the amount of his said bid in cash, it is this twenty-second day of January, 1885, considered and ordered by the court that said petition and answer of said Camden is not a defense to said rule. It is further ordered that the exceptions to said report be and the same are hereby sustained, and the said sale is set aside, and the said commissioners will proceed at once to advertise and resell said property in accordance with the terms and provisions of said former decree passed in this cause on the seventeenth day of November, 1883, for cash, which sale will be made at the costs of said Camden. And if the said property should be sold for a less sum than $173,050, the said bid of the said Camden, the court reserves, for future determination in this cause, the question whether the said Camden will be required to pay the deficiency."

Under this order the property was again offered for sale on the seventeenth of March, and sold to Charles H. Shattuck for $119,100, he being the highest and best bidder. The purchase money was paid at the time of the sale, and is now in court. After this sale was reported to the court, the Toledo National Bank, Valentine, and Blair filed their petition asking that, before the sale should be confirmed, the court would, if necessary, modify its order of January 22d, so as to hold Camden on his bid, or for the deficiency between his bid and that of Shattuck, and to require Camden to take the property at his bid,

and, if he failed to do so, to confirm the sale to Shattuck, unless Thompson, Payne, and Chancellor elected to take and pay for the property at their bid of $173,000. The same parties also filed exceptions to the report, the object of which was to secure the same action which was asked for in the petition. Camden filed: (1) A motion to strike this petition from the files; and (2) an answer without prejudice to this motion. Loomis has also filed a petition to the same general effect, and with substantially the same prayer. In this petition the following averment is made: "11. The commissioners offered said property again on the seventeenth day of March, 1885, at which time some arrangement had been made by which the interests of the Standard Oil Company and the parties represented by Receiver Shattuck had been settled upon a basis not known to your petitioner, under which the property was to be bought at the lowest figure at which it could be got. And Mr. Robert Garrett, whom Mr. Shattuck formerly, as now, represented, in part at least, and who had been the real party on the first bid of $163,000, had some tacit or express, direct or indirect, understanding with Mr. Camden and his friends, whereby the property should be bought for a low figure, and without competition between them. And the said Camden now desires this sale to be confirmed at $119,100, and pretends that he is not liable on his bid of $173,050."

To this Camden answered as follows: "Respondent denies that any such arrangements were entered into as set out in charge 11 of said petition, but refers to his answer hereinbefore referred to, and relies upon the same as his answers to this charge, in so far as said answer is responsive thereto." The answer "hereinbefore referred to" is that filed to the petition of the other creditors, and the part of it which is responsive to the allegation of Loomis is as follows: "Respondent admits that the property being large and valuable, and the probable amount for which it would sell being large, that the sale being for cash would be more than any one individual would be willing to raise and invest in that character of property; and that certain persons, some of whom are named in the petition, did agree to join in the purchase of said property; and, if the property was so purchased by them, that they would form a corporation to own and work said property. Respondent denies that there was any combination or intention on his part to beat down the price of said property, or to procure the same for less that its fair cash value. On the contrary thereof, said arrangement was entered into *bona fide* to compete for the purchase of the said property, and to bid for the same to the fair value thereof; and respondent states, as his opinion and belief, that without such an arrangement the property would not have brought as much as it did at that sale. Respondent avers that none of parties were interested in any of the liens upon said property except the Thompson debt, represented by himself; that many of the other lien creditors were present at said sale, as he is informed, and that others were present by counsel; that the sale was fair and open, and ample opportunity afforded to all interested to bid for the same; and to the best of his information, from the present condition and character of the property, the same was sold for all it would bring, and more than it would now probably bring upon another resale."

Since the first day of May, 1884, there has been paid to Camden by the receiver the following sums, to apply on his claim as assignee of Thompson:

| | |
|---|---:|
| January 3, 1885, | $2,000 00 |
| January 30, 1885, | 7,000 00 |
| February 27, 1885, | 1,500 00 |
| March 16, 1885, | 809 07 |

About these facts there is little if any dispute, and I have no hesitation in holding that Camden, by his purchase at the sale of October 1, 1884, became personally bound for the payment of the price

in money or its equivalent. The bid of Thompson and Payne must be taken to have been *bona fide,* for they were under bonds to make it. When Camden bid over them he gave no notice that he expected to pay otherwise than in money. He does not pretend that he had then or now any assignment of the claims payable out of the purchase money except that of Thompson, and perhaps that of Loomis, unless the alleged contract was sufficient of itself for that purpose. This contract was not signed by all the parties named in it, and there is nothing to indicate that any were to be bound until the execution by all was complete.

When the property was first put up for sale Camden was as much bound by the contract as he ever has been, but he then designedly refrained from bidding, and allowed a purchaser to buy at a price far below what, if the contract was in force, he should have offered. This made it necessary for the other creditors to resort to other means for the protection of their interests. And some of them did so. In this way a sale was secured for an amount in cash sufficient to pay all in full except Loomis. Camden afterwards saw fit to resist the confirmation of this sale, and for that purpose he joined with Loomis. All of the other creditors were in favor of the confirmation. In the exceptions, which were filed in the name of Loomis, no mention was made of the contract, and it was not intimated at the hearing, in any way, that the purpose of the contestants was to give Camden another opportunity to buy under the contract. All parties, so far as appearances were concerned, treated the contract as no longer an element in the case. The sale was finally set aside because of inadequacy of price, which was shown by an advance cash bid from other responsible parties. Camden now claims, in his answers to the petitions filed against him, that the decree of November 17, 1883, was entered up by consent of parties in a different form from what it would have been were it not for the contract; but there is no proof of that fact, and he himself does not state what these changes were. So far as appears from the face of the decree, the only consents were those of Thompson (Camden) and Loomis, that Storrs should be paid first from the money in the hands of the receiver, instead of *pro rata* with them; and that of Loomis, that Thompson (Camden) should be next paid in full before anything was distributed to him. But by the terms of the contract Thompson (Camden) was to be paid in full from the earnings of the property before Loomis was entitled to anything. I am unable to see how Camden has lost anything by his consent to the decree.

In his answer Camden states as his excuse for not bidding at the first sale that some uncertainty then existed as to his right to use the Loomis debt as money to pay for the purchase; but the same difficulty existed when he bid in October. No change had been made as to that part of the case between the first sale and the second to relieve Camden from embarrassment in this particular. All he says on that

subject in his answer is that "the proceedings attacking the debt of Loomis were dismissed or so modified by the opinion or action of the court in entering decrees ordering a resale under said former decree, that respondent was advised and believed that the obstacles to his bidding under said contract were substantially removed." He fails entirely to state what the modifications were, and I can discover nothing in the order to which such an effect can be given. Under the circumstances, it is clear to my mind that Camden could not use the alleged contract in lieu of money to pay his bid. The claims of the different creditors had not been assigned to him, and he was in no condition to call on a court of equity to require the creditors to make such assignments. As the contract was not available to him for the purposes of payment, it was incumbent upon him to pay in money.

The liability of Camden originally for the payment of his bid in money on the confirmation of the sale having thus been established, the next inquiry is whether, in the proceedings since his bid, anything has been done to release him from that liability. In his answers he states his claim as to this part of the case in these words:

"Respondent is advised by counsel that the court having refused to confirm said sale at the bid so made by the respondent, and in entering a decree ordering a resale of said property, that all liability on the part of respondent for such deficiency was determined, and respondent discharged therefrom; that respondent was not liable as purchaser at sale until the court had accepted the bid of respondent and confirmed the sale absolutely."

And in another place:

"Respondent, however, submits that by said decree of resale he was discharged from further liability upon his bid of $173,050; there being no acceptance of said bid by the court, and a confirmation of said sale, which, respondent is advised, were necessary to charge him under said bid."

It is true, as was contended in argument, that in chancery a bidder at a sale by a master, under a decree of court, is not considered a purchaser until the report of sale is confirmed; and that he cannot be compelled to complete his purchase until the confirmation of the report; that is, until his bid has been in some form accepted by the court, as the court stands in the place of a vendor, using the master to receive and report the bids. Sugd. Vend. & Pur. (3d Lond. Ed.) 38, 39; (1st Amer. Ed. 33.) Under the old English practice an order *nisi* was first entered as of course, and this was afterwards made absolute, also of course, unless cause was shown to the contrary. The purpose of the whole proceeding was to show that the court accepted the bid and made the sale. Sugd. Vend. & Pur. 39, *supra.*

In the present case the commissioners reported the sale in due form, and Camden asked the court to take his alleged contract in lieu of money and confirm the report. The creditors in interest adverse to his petition asked that he be required to pay in money, and for a confirmation on that basis. No one else appeared to resist. There was no dispute about the regularity of the proceedings at the sale,

or the sufficiency of the price, or the title to the property. The difficulty was not as to the sale, but as to how it should be paid for. Camden did not ask to be released from his purchase because of a misunderstanding as to his rights, but only that he might be allowed to pay the price in a particular way. The creditors did not ask to have the sale set aside if the money was paid, and to get the money they obtained a rule on Camden. The defense of Camden to this rule was, not that he could not be required to pay because the sale had not been confirmed, but in effect that as, by the terms of a contract he claimed to have with the creditors, he would be entitled to the money when paid in, the contract should be taken in lieu of the money, to avoid unnecessary circuity of action.

When, therefore, under the circumstances, the court decided that Camden must pay in money, it in effect confirmed the report of sale, and required him to act accordingly. The order which was entered at the time may not have been expressed with precise technical accuracy, but its meaning is clear; the sale was confirmed on the basis of a bid for cash, no other having been made, and as the money had not been paid, a resale was ordered at the costs of Camden, leaving the question open whether it should be at his risk. It is true that in the order this language occurs: "It is further ordered that the exceptions to said report and the same are hereby sustained, and the sale set aside, and the said commissioners will proceed at once to advertise and resell," etc. But this, when taken in connection with the rest of the order, was clearly intended only as a provision to relieve the subsequent sale from embarrassment by reason of the former one to Camden, and not to discharge him from liability for a deficiency between his own bid and any that might be made and accepted by the court under the resale which was ordered. Camden had full notice that the purpose of the court was to charge him for a deficiency, if upon further inquiry it should be found he was liable. No room whatever was left for a misunderstanding on that subject, and the order of January 22d was made during the present term, and is still under the control of the court, except so far as the rights of third persons have intervened. The answers of Camden satisfy me that he is interested directly or indirectly in the present purchase by Shattuck. For this reason I am not inclined to consider Shattuck as having an interest which will interfere with the right of the court to make such modification of that order as may now seem to be just. I am also satisfied that the order of November 3, 1884, canceling the bond of Thompson, Payne, and Chancellor, was made under a misapprehension of the facts, and ought to be vacated. It is therefore ordered that Camden elect here and now whether he will take the property at his bid of $173,050 and pay for it in money. If he will, and he makes his payment within a reasonable time, to be fixed if required, the sale to Shattuck will be set aside, and that to him on the first of October, 1884, carried into effect by proper order. If Camden does

not elect to take the property, it will be ordered that he now, as the agent who made the bid for Thompson and Payne on the first October, elect for them whether they will take the property at $173,000, and pay for it. If he does so elect, a reasonable time will be given them to make the payment, and the proper orders made to perfect a transfer of the property to them under their bid of October 1, 1884. Should neither Camden nor Thompson and Payne elect to take the property under these orders, the sale to Shattuck will be confirmed, and a personal decree rendered against Camden for the deficiency. The order of November 3, 1884, canceling the bond of Thompson, Payne and Chancellor, will also be vacated.

BOND, J., concurs.